2022-2105

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

ADEE HONEY FARMS, et al.,
*Plaintiffs*

MONTEREY MUSHROOMS, INC.,
*Plaintiff-Appellant*

v.

UNITED STATES, UNITED STATES CUSTOMS AND BORDER
PROTECTION, CHRISTOPHER MAGNUS, Commissioner of U.S. Customs
and Border Protection,
*Defendants-Appellees*

Appeal from the United States Court of International Trade in No. 1:16-cv-00127-
TCS, Senior Judge Timothy C. Stanceu

REPLY BRIEF OF PLAINTIFF-APPELLANT
MONTEREY MUSHROOMS, INC.

Adam H. Gordon
Jennifer M. Smith
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700

Dated: May 5, 2023     *Counsel to Plaintiff-Appellant Monterey
Mushrooms, Inc.*

**FORM 9. Certificate of Interest**                                                    Form 9 (p. 1)
                                                                                          July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-2105 |
| **Short Case Caption** | Adee Honey Farms v. US |
| **Filing Party/Entity** | Monterey Mushrooms, Inc. |

> **Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/05/2023

Signature:  /s/ Adam H. Gordon

Name:  Adam H. Gordon

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Monterey Mushrooms, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| The Bristol Group PLLC | Adam H. Gordon, Esq. | Jennifer M. Smith, Esq. |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| Hilex Poly Co., LLC v. US, CAFC Ct. No. 22-2106 | American Drew v. US, CAFC Ct. No. 22-2114 | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................1

ARGUMENT ..................................................................................4

I.    Customs' Failure to Distribute Delinquency Interest Under the CDSOA Was Unlawful ...........................................................4

    A.    The Plain Language of the CDSOA Requires Customs to Distribute Delinquency Interest ....................................4

    B.    Customs' Reading of the CDSOA Violates Multiple Basic Canons of Statutory Construction ...............................5

        1.    Customs' Interpretation Is Contrary to the Ordinary Meaning of the Word "All" ............................6

        2.    Customs' Interpretation Would Impermissibly Rewrite the Statute ..................................8

        3.    Customs' Interpretation Is Neither Holistic Nor Contextual ..................................................9

    C.    Delinquency Interest Is "Earned on" AD/CVD Duties Because Liquidation Does Not Extinguish Them .................................11

    D.    TFTEA Shows That Congress Intended Delinquency Interest to Be Distributed Under the CDSOA............................14

II.    The Court Should Not Defer to Customs' Decision Not to Distribute Delinquency Interest.........................................................17

    A.    Congress Delegated Customs Only Limited Authority to Prescribe Logistical Procedures, Not to Substantively Interpret or Modify the Statute ................................................18

B.    The Administrative Record Shows That Customs Did Not Interpret the CDSOA When It Decided Not to Distribute Delinquency Interest ...................................................19

        1.    Customs Initially Planned to Include Delinquency Interest in CDSOA Distributions....................................19

        2.    The Documents Cited by Customs Are Irrelevant Because They Are Unrelated to Delinquency Interest ...21

        3.    Customs' Proposed Rule Was Silent Regarding Distribution of Delinquency Interest ..............................21

        4.    Customs' Subsequent Internal Decision Not to Distribute Delinquency Interest Was Due to Technological Limitations......................................................22

        5.    Customs' Final Rule Was Also Silent Regarding Distribution of Delinquency Interest ..............................23

        6.    Customs First Disclosed Its Decision Not to Distribute Delinquency Interest More Than a Decade Later ..........25

C.    Customs Did Not Promulgate an Authoritative Statutory Interpretation That Is Entitled to *Chevron* Deference ..............25

D.    Customs' "Interpretation" Is Unreasonable ............................26

        1.    Customs Failed to Explain Its Decision Not to Distribute Delinquency Interest During the Rulemaking Process...27

        2.    Customs' Reliance on Technological Limitations Is Not a Reasonable Excuse for Ignoring the Statute...................28

        3.    The Trade Court Improperly Deferred to Its Own Interpretation of the Statute ...........................................30

III.    Monterey's Pre-2014 Claims Are Timely...........................................31

CONCLUSION ...............................................................33

## TABLE OF AUTHORITIES

### CASES

*Aqua Prods., Inc. v. Matal*,
  872 F.3d 1290, 1320 (Fed. Cir. 2017) .................................................32

*Bowen v. Georgetown University Hosp.*,
  488 U.S. 204 (1988) ...........................................................................29

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ...................................................................... 29, 30

*Chevron, U.S.A., Inc. v. Natural Resource Defense Council Inc.*,
  467 U.S. 837 (1984) ................................................................... passim

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) .............................................................................6

*Corley v. United States*,
  556 U.S. 303 (2009) .............................................................................8

*Duncan v. Walker*,
  533 U.S. 167 (2001) .............................................................................8

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .................................................................. 26, 27, 30

*Facebook, Inc. v. Windy City Innovations, LLC*,
  973 F.3d 1321 (Fed. Cir. 2020) ...........................................................19

*Gardner v. State of N.J.*,
  329 U.S. 565 (1947) .............................................................................7

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) .................................................................... 18, 26

*Life Techs. Corp. v. Promega Corp.*,
  137 S. Ct. 734 (2017) ...........................................................................6

*Luminant Generation Co. v. EPA*,
  675 F.3d 917 (5th Cir. 2012)................................................................26

*Mid Continent Nail Corp. v. United States*,
  846 F.3d 1364 (Fed. Cir. 2017) .........................................................32

*Mitsubishi Elecs. Am., Inc. v. United States*,
  44 F.3d 973 (Fed. Cir. 1994) ...............................................................31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................... 28, 29

*N.H. Hosp. Ass'n v. Azar*,
  887 F.3d 62 (1st Cir. 2018) ...................................................... 24, 25, 26

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  138 S. Ct. 617 (2018) .............................................................................8

*Nielsen v. Preap*,
  139 S. Ct. 954 (2019) ..........................................................................10

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*,
  499 U.S. 117 (1991) ...............................................................................7

*Perrin v. United States*,
  444 U.S. 37 (1979) .................................................................................6

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) .............................................................7

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) .............................................................................30

*Sharp v. United States*,
  580 F.3d 1234 (Fed. Cir. 2009) .............................................................8

*Syva Co. v. United States*,
  681 F. Supp. 885 (Ct. Int'l Trade 1988) ...............................................11

*United States v. Am. Home Assur. Co.*,
  789 F.3d 1313 (Fed. Cir. 2015) ...................................................... 7, 14

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) .................................................... 18, 25, 26

*United States v. Wash. Int'l Ins. Co.*,
   177 F. Supp. 2d 1313 (Ct. Int'l Trade 2001) ........................................................11

*Util. Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014) .................................................................................. 28, 29

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ........................................................................................26

## STATUTES

19 U.S.C. § 1500 .............................................................................................12

19 U.S.C. § 1505(d) ................................................................................ passim

19 U.S.C. § 1514 .............................................................................................12

19 U.S.C. § 1675c ...................................................................................... 10, 11

19 U.S.C. § 1675c(c) ................................................................................. 18, 21

19 U.S.C. § 1675c(d)(3) ........................................................................... passim

19 U.S.C. § 1675c(e) .......................................................................................14

19 U.S.C. § 1675c(e)(2) ........................................................................... passim

19 U.S.C. § 1675c(e)(3) ............................................................................ 18, 21

19 U.S.C. § 1677g .................................................................................... 12, 23

19 U.S.C. § 4401(a) .........................................................................................14

19 U.S.C. § 4401(c)(1) .....................................................................................15

19 U.S.C. § 4401(c)(2) .....................................................................................15

28 U.S.C. § 1581(i) .........................................................................................31

28 U.S.C. § 2636(i) .........................................................................................31

Trade Facilitation and Trade Enforcement Act of 2015,
   Pub. L. 114-125 § 605 (2016), codified at 19 U.S.C. § 4401 ...................... passim

# REGULATIONS

19 C.F.R. § 159.61 ...................................................................2

19 C.F.R. § 159.62 ...................................................................2

19 C.F.R. § 159.63 ...................................................................2

19 C.F.R. § 159.64 ...................................................................2

19 C.F.R. § 159.64(e)........................................................... 21, 26

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Distribution of Continued Dumping and Subsidy Offset to*
  *Affected Domestic Producers*,
  66 Fed. Reg. 48,546 (Sept. 21, 2001) ........................................ passim

*Distribution of Continued Dumping and Subsidy Offset to*
  *Domestic Producers*,
  66 Fed. Reg. 33,920 (June 26, 2001) ......................................... passim

## MISCELLANEOUS AUTHORITIES

162 Cong. Rec. S833-884, 843 (daily ed. Feb. 11, 2016) ........................... 2, 16, 17

_____

## REPLY BRIEF OF PLAINTIFF-APPELLANT
## MONTEREY MUSHROOMS, INC.

_____

## <u>INTRODUCTION</u>

This is, fundamentally, a simple case.  In the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA" or the "Byrd Amendment"), Congress expressly and unambiguously required U.S. Customs and Border Protection ("Customs or "CBP")[1] to distribute "<u>all</u>" interest earned on antidumping ("AD") and countervailing ("CVD") duties to "affected domestic producers" ("ADPs").  19 U.S.C. § 1675c(d)(3), (e)(2) (emphasis added).  The agency ignored Congress's unambiguous express statutory command when it failed to distribute 19 U.S.C. § 1505(d) <u>delinquency interest</u> to ADPs, including Plaintiff-Appellant Monterey Mushrooms, Inc. ("Monterey").

From the outset, Customs understood that it had to distribute delinquency interest to ADPs and considered "possible methods for" doing so, in connection with "the proposed rulemaking" regarding procedures for CDSOA distributions. Appx4188.  Ultimately, however, Customs made an internal decision not to distribute delinquency interest to ADPs.  *See* Appx4256.  The "<u>only reason</u>" for

_____

[1] The agency was named the U.S. Customs Service when the statute was enacted, but subsequently became CBP.  *See* Appx0003.

Customs' decision was "<u>technological limitations</u>" of its automated system, which could not separately identify delinquency interest amounts attributable to CDSOA-subject duties.  Appx3683 (emphasis added).  Bureaucratic laziness in failing to make necessary technological changes or calculations cannot excuse Customs' failure to follow the statute, and is certainly not entitled to deference.

Customs did not publicly announce its decision not to distribute delinquency interest to ADPs, much less provide any contemporaneous explanation for it.  Both the Proposed Rule and the Final Rule are silent regarding delinquency interest.  *See Distribution of Continued Dumping and Subsidy Offset to Domestic Producers*, 66 Fed. Reg. 33,920 (June 26, 2001) ("Proposed Rule"); *Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers*, 66 Fed. Reg. 48,546 (Sept. 21, 2001) ("Final Rule"), *codified at* 19 C.F.R. §§ 159.61-64.

As a result of Customs' unlawful decision, the Government has unjustly enriched its own coffers at the expense of the intended beneficiaries of the statute — the ADPs.  *See* 162 Cong. Rec. S833-884, 843 (daily ed. Feb. 11, 2016) (statement of Sen. Thune) (noting that the CDSOA required "all interest on" AD/CVD duties "to be paid to the injured domestic producers," but Customs' failure to do so "cost domestic producers tens of millions of dollars over the years").  Congress sharply denounced Customs' "unfounded practice" of "ignor[ing] the direction of the statute to pay all interest to producers," *id.*, and

provided a partial remedy when it enacted the Trade Facilitation and Trade Enforcement Act of 2015, ("TFTEA"), Pub. L. 114-125 § 605 (2016), codified at 19 U.S.C. § 4401.

Customs' decision not to distribute delinquency interest under the CDSOA is not entitled to any deference under fundamental tenets of administrative law. As Customs' decision was based on its own "technological limitations," Appx3683, and was not contemporaneously publicized or explained, that decision can hardly be characterized as an "interpretation" of the statute. In any event, Customs' "interpretation" does not qualify for deference under the framework of *Chevron, U.S.A., Inc. v. Natural Resource Defense Council Inc.*, 467 U.S. 837 (1984), because (1) the statute unambiguously requires Customs to distribute "all" interest earned on AD/CVD duties, which includes delinquency interest, and (2) Customs' determination to the contrary is not a reasonable interpretation of the statute.

Customs' arguments to this Court are merely obfuscation and *post hoc* rationalization for purposes of this litigation. Customs and the U.S. Court of International Trade ("Trade Court") have sought to overcomplicate the issues and substituted their own judgments for Congress's. This Court must finally hold Customs accountable to the plain language of the statute.

# ARGUMENT

## I. CUSTOMS' FAILURE TO DISTRIBUTE DELINQUENCY INTEREST UNDER THE CDSOA WAS UNLAWFUL

### A. The Plain Language of the CDSOA Requires Customs to Distribute Delinquency Interest

The plain language of the CDSOA unambiguously requires Customs to collect and distribute <u>all</u> interest, including delinquency interest, to ADPs. The CDSOA states that Customs:

(1) "shall deposit into…special accounts <u>all</u> antidumping or countervailing duties (<u>including interest</u> earned on such duties) that are assessed after the effective date…under the antidumping order or finding or the countervailing duty order with respect to which the account was established"; and

(2) "shall distribute <u>all funds</u> (<u>including all interest</u> earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers…."

19 U.S.C. § 1675c(d)(3), (e)(2) (emphases added).

Two types of statutory interest are relevant here. The first, 19 U.S.C. § 1677g interest, is collected on underpayments of AD/CVD duties if the final amount assessed at liquidation is greater than the amount deposited at the time of entry. Such interest is assessed as part of the final duty owed at liquidation and accrues from the date of the initial duty deposit to the date of liquidation.

The second, 19 U.S.C. § 1505(d) "delinquency" interest, is collected from importers and sureties when an importer fails to pay any bill for duties, fees, and

4

interest owed within 30 days of liquidation.  The language of section 1505(d) in

effect when the CDSOA was passed (which has not significantly changed since)

stated:

> If <u>duties</u>, fees, and interest determined to be due or refunded are
> not paid in full within the 30-day period…, any unpaid balance
> shall be considered delinquent and <u>bear interest</u> by 30-day
> periods, at a rate determined by [Customs], from the date of
> liquidation…until the full balance is paid.  No interest shall
> <u>accrue</u> during the 30-day period in which payment is actually
> made.

19 U.S.C. § 1505(d) (emphases added).  The words "bear interest" and "accrue"

make clear that delinquency interest is earned on the AD, CVD, and other duties,

as well as fees and interest, that are billed.  Therefore, delinquency interest is a

form of "interest earned on" AD/CVD duties.  Accordingly, Customs must deposit

and distribute all interest, including delinquency interest, earned on AD/CVD

duties under the CDSOA.

### B. Customs' Reading of the CDSOA Violates Multiple Basic Canons of Statutory Construction

Customs contends that the CDSOA only requires distribution of section

1677g interest.  *See* Defs.-Appellees' Br. 26-44.  Customs purports to rely on the

"whole-text" canon of statutory interpretation.  *Id.* at 26.  Yet Customs'

interpretation is neither holistic nor consistent with the context of the statute.

Rather, Customs' interpretation is inconsistent with the statute's plain language

and the ordinary-meaning, surplusage, grammar, and whole-text canons of statutory construction.

The Supreme Court has stated that "in interpreting a statute a court should always turn first to one, cardinal canon before all others" — *i.e.*, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Congress said what it meant and meant what it said when it required distribution of "all" interest in the CDSOA.

### 1. Customs' Interpretation Is Contrary to the Ordinary Meaning of the Word "All"

Customs asserts that "all interest" does not "mean every kind of" interest. Defs.-Appellees' Br. 39. This assertion is contrary to the "fundamental canon of statutory construction…that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The ordinary meaning of the word "all" is "the whole amount, quantity, or extent of," "as much as possible," "every member or individual component of," "the whole number or sum of," or "EVERY." Merriam-Webster.com Dictionary, "all" (last visited Apr. 26, 2023), https://www.merriam-webster.com/dictionary/all; *accord Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 740 (2017) ("'All' means the entire quantity….").

Courts have repeatedly recognized the broad definition and nature of the word "all." *See, e.g.*, *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 128 (1991) (noting that an exemption from "'the antitrust laws and all other law, including State and municipal law,' is clear, broad, and unqualified"); *Gardner v. State of N.J.*, 329 U.S. 565, 573 (1947) ("The words 'all holders of claims' have no qualification…."); *United States v. Am. Home Assur. Co.*, 789 F.3d 1313, 1325 (Fed. Cir. 2015) ("The language — 'all bonds'…— is clear and unqualified."); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) ("The words 'all embodiments of the present invention' are broad and unequivocal.").

The contextual limitations in some of those cases cited by Customs are <u>not</u> on the adjective "all" but on the words that "all" <u>modifies</u> ("law" in *Norfolk & Western* and "the present invention" in *SciMed*). *See* Defs.-Appellees' Br. 39-40. Here, as in those cases, the context is limited to the word "interest," but there is no qualification or limitation in the text of the statute that excludes delinquency interest from "all" interest.[2]

---

[2] Although Customs notes that "neither the term 'delinquency interest' nor the statute associated with it, 19 U.S.C. § 1505(d), can be found in the" CDSOA, Defs.-Appellees' Br. 36, the same is true with respect to section 1677g interest. The CDSOA did not specifically reference either interest statute because it broadly encompasses "all" interest.

## 2. Customs' Interpretation Would Impermissibly Rewrite the Statute

Customs effectively reads the word "all" out of the CDSOA. *See* Defs.-Appellees' Br. 26, 39. "The Government's reading is thus at odds with one of the most basic interpretive canons, that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and citation omitted); *accord Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) (rejecting the Government's interpretation, "which would violate the canon that we must 'give effect, if possible, to every clause and word of a statute' and should avoid rendering any of the statutory text meaningless or as mere surplusage" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

At the same time, Customs would effectively <u>add</u> the words "section 1677g" to modify the word "interest" in the CDSOA. *See* Defs.-Appellees' Br. 26. This Court must not rewrite the statute in this way. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 629 (2018) ("Of course, those are not the words that Congress wrote, and this Court is not free to 'rewrite the statute' to the Government's liking." (citation omitted)).

### 3. Customs' Interpretation Is Neither Holistic Nor Contextual

All parties agree that the Court must consider the entire text, context, and structure of the statute. *See* Pl.-Appellant's Br. 19-20; Defs.-Appellees' Br. 26-27, 35. Despite invoking the "whole-text canon," Customs fixates on and parses the parenthetical in 19 U.S.C. § 1675c(e)(2) and two specific words — "assessed" and "under" — but fails to analyze them properly in context of the entire statute. Defs.-Appellees' Br. 26-33, 36-39.

Customs mischaracterizes the context of the parenthetical in 19 U.S.C. § 1675c(e)(2). *See* Defs.-Appellees' Br. 31-33. The parenthetical "(including interest earned on such duties)" follows and modifies the phrase "all antidumping or countervailing duties," which immediately precedes it. 19 U.S.C. § 1675c(e)(2). The parenthetical defines the phrase expansively to include "all" "interest earned on" AD/CVD duties, which includes delinquency interest, along with the duties themselves.

The parenthetical in section 1675c(e)(2) parallels the parenthetical appearing earlier in the statute at section 1675c(d)(3), which Customs ignores. *See* Defs.-Appellees' Br. 31-33. In 19 U.S.C. § 1675c(d)(3), the parenthetical "(including all interest earned on the funds)" follows and modifies the phrase "all funds," which immediately precedes it. The parenthetical in section 1675c(d)(3) similarly defines

the phrase expansively to include "all interest," which includes delinquency interest, along with the funds themselves.

Customs also argues that in 19 U.S.C. § 1675c(d)(3) and (e)(2), the word "interest" is "modified by the word 'assessed,'" and those provisions are limited only to interest that is "assessed" at liquidation because "[t]he use of the word 'assessed' implicates a specific temporal event:  liquidation."  Defs.-Appellees' Br. 27-30, 36-38.  Indeed, Customs assumes that the statute contains "'at liquidation' language," *id.* at 36, but such language does not appear anywhere in the CDSOA, *see* 19 U.S.C. § 1675c.

The Trade Court properly rejected that argument.  *See* Appx0014 n.8.  As the Trade Court explained, "[t]he subject of the sentence containing the predicate 'are assessed' is the plural term 'duties,' not the singular term 'interest.'  An interpretation that accords with plain meaning should not dispense with agreement between subject and verb."  *Id.*  "Because [w]ords are to be given the meaning that proper grammar and usage would assign them, the rules of grammar govern statutory interpretation unless they contradict legislative intent or purpose." *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019).

Similarly, the word "under" in 19 U.S.C. § 1675c(e)(2) is part of the plural predicate "are assessed under," which modifies the plural subject "duties," not the singular "interest" cited by Customs.  *See* Defs.-Appellees' Br. 30.  Delinquency

interest on AD/CVD duties would not be owed by an importer in the absence of an AD/CVD order.

As Customs' position fails basic rules of grammar, it cannot be a proper interpretation of the statute.

Further, delinquency interest is assessed. *See Syva Co. v. United States*, 681 F. Supp. 885, 888 (Ct. Int'l Trade 1988) (stating that delinquency interest is "a monetary assessment incidental to the importation of goods"); *see also United States v. Wash. Int'l Ins. Co.*, 177 F. Supp. 2d 1313, 1317 (Ct. Int'l Trade 2001) (noting Customs' contention that it "is statutorily required to assess and collect [delinquency] interest on…unpaid duties, fees and interest" (internal quotation marks and citation omitted)).

## C. Delinquency Interest Is "Earned on" AD/CVD Duties Because Liquidation Does Not Extinguish Them

Nothing in the CDSOA limits the interest that must be distributed only to interest that is "assessed" at liquidation, to the exclusion of interest that accrues thereafter. *See* 19 U.S.C. § 1675c; Appx0014 n.8. Yet Customs' whole argument is premised on the assumption that liquidation somehow magically transforms assessed AD/CVD duties into something else entirely. *See* Defs.-Appellees' Br. 8-11, 17-18, 27-323, 36-40.

The Trade Court apparently subscribed to that faulty premise. *See* Appx0021-0022. Despite finding that "the plain meaning of the phrase 'interest

earned on such duties,' at first blush, does not favor the agency's interpretation," the Trade Court contrived an ambiguity with respect to the phrase "earned on" by "look[ing] beyond the CDSOA to other Tariff Act provisions."  Appx0013-0016, Appx0021-0022.  Specifically, the Trade Court determined that liquidation, referenced in 19 U.S.C. §§ 1500 and 1514, means that "the individual amounts of duties and fees (including the amount of antidumping or countervailing duties, together with any interest required to be assessed by 19 U.S.C. § 1677g) are 'fixed,' i.e., ascertained" and "combined into a single sum," such that "interest earned on a delinquent payment of an already-liquidated entry can be viewed as having been earned on the single, liquidated sum that is in arrears."  Appx0021-0022, Appx0024.

The Trade Court cited no authority for its determination that the duty amounts lose their individual character at liquidation.  Nothing in the Tariff Act supports that determination.

Sections 1500 and 1514 only indicate the amount of duties generally becomes fixed and final at liquidation.  That is consistent with the CDSOA's usage of the term "assessed" to modify the word "duties," not "interest."  Sections 1500 and 1514 do not indicate that the duties somehow become something else or mention any form of interest.  Customs apparently recognizes that those statutes do not support its position, as it did not cite them anywhere in its brief.

Importantly, any underpaid AD/CVD duties and section 1677g interest are necessarily billed, collected, and deposited into the special account for distribution to ADPs after liquidation whenever the final, assessed duties exceed cash deposits. Accordingly, there is nothing talismanic about whether money was paid or owed "at liquidation" versus "after liquidation" when it comes to what funds must be deposited in the special account and then distributed under 19 U.S.C. § 1675c(d)(3) and (e)(2).

Customs now asserts that "Section 1505(d) delinquency interest…is not 'earned on' antidumping and countervailing duties…; rather it is earned on a different pool of money encompassing normal tariffs and fees entirely unconnected from such duties." Defs.-Appellees' Br. 18. This assertion is inconsistent with the plain language of 19 U.S.C. § 1505(d), which enumerates "duties, fees, and interest" separately.

Customs' assertion is also inconsistent with the axiomatic distributive property of mathematics, whereby multiplying a sum by a number is the same as multiplying each addend by the number and then adding the products. *I.e.*, Balance Sum x Delinquency Interest Rate = (AD Duty x Delinquency Interest Rate) + (CVD x Delinquency Interest Rate) + (Normal Duty x Delinquency Interest Rate) + (Fees x Delinquency Interest Rate) + (Section 1677g Interest x Delinquency Interest Rate).

This Court has recognized that "Section 1505(d) interest is a <u>straightforward</u> <u>sum</u> that is calculated in the event that the duties and fees at liquidation are not paid in a timely manner." *United States v. Am. Home Assurance Co.*, 857 F.3d 1329, 1337 (Fed. Cir. 2017) (emphasis added). Accordingly, Customs can and should be able to delineate delinquency interest on AD/CVD duties versus other duties, fees, and interest. In fact, Customs has done so for the purposes of TFTEA distributions and this litigation. *See* Appx0631-0797, Appx1314-1315.

The "only reason" for Customs' failure to distribute delinquency interest to ADPs was the inability of its automated system to do this basic math. Appx3683. That is no excuse for Customs' failure to distribute "all' interest as required by the statute.

### D. TFTEA Shows That Congress Intended Delinquency Interest to Be Distributed Under the CDSOA

Customs also argues that "one should construe the text of the original statute enacted in 2000 through the lens of" TFTEA, which was enacted sixteen years later. Defs.-Appellees' Br. 12, 27.

TFTEA requires that Customs "shall deposit all interest described in subsection (c) into the special account established under" 19 U.S.C. § 1675c(e) "for inclusion in" CDSOA distributions "made on or after February 24, 2016." 19 U.S.C. § 4401(a). Subsection (c)(1) specifies that:

Interest described in this subsection is interest earned on antidumping duties or countervailing duties…that is realized through application of a payment received on or after October 1, 2014, by U.S. Customs and Border Protection under, or in connection with—

   (A)   a customs bond pursuant to a court order or judgment; or

   (B)   a settlement with respect to a customs bond, including any payment made to U.S. Customs and Border Protection with respect to that bond by a surety.

*Id.* § 4401(c)(1).  Subsection (c)(2) broadly defines the types of interest to "includ[e]…[i]nterest accrued under" sections 1677g and 1505(d), *inter alia*.

*Id.* § 4401(c)(2).

   TFTEA's requirement that Customs deposit and distribute "all interest," explicitly defined as including delinquency interest, is entirely consistent with the CDSOA's requirement that Customs deposit "all" interest and distribute "all interest."  19 U.S.C. § 1675c(d)(3), (e)(2) (emphases added).  Congress knew how to include "all interest," Defs.-Appellees' Br. 41, and explicitly did so in both the CDSOA and TFTEA.[3]

---

[3] TFTEA's focus on amounts recovered under bonds followed a $6.1 million judgment against Great American Insurance Company of New York and a $231,638.67 settlement agreement between the Government and surety Hartford Fire Insurance Company, both in March 2014.  Appx4271-4272, Appx4278.  Customs' failure to distribute delinquency interest from the Great American judgment precipitated the public discovery of this issue.  Appx4272.

Customs argues that TFTEA would have been "unnecessary" if the CDSOA already required distribution of all delinquency interest. Defs.-Appellees' Br. 17-19, 27, 34-35. This *post hoc* argument is perverse because the legislative history makes clear that TFTEA was enacted specifically <u>because of</u> Customs' failure to follow the plain language of the CDSOA.

Senator Thune commented:

> Duties collected on dumped imports and all interest on those duties…were to be paid to the injured domestic producers to allow them to reinvest and rebuild. <u>For reasons that defy simple explanation, CBP ignored the direction of the statute to pay all interest to producers</u> and instead deducted some types of interest from payments to producers.

> In effect, this practice amounted to forcing…producers to pay for the delays caused by Chinese dumpers, the U.S. insurance companies that posted bond for the duties, and in some cases of CBP itself. <u>This practice defies the plain language of the statute</u> and cost domestic producers tens of millions of dollars over the years.

> During the Finance Committee markup of this legislation, Senator GRASSLEY, Senator NELSON, and I offered an amendment which is included in this conference report that <u>corrects CBP's misreading of the law</u>. This is an important victory for honey, crawfish, garlic, and mushroom [producers] that have suffered from Chinese dumping and CBP's unfounded practice.

162 Cong. Rec. 843 (emphases added).

This statement confirms that Congress had always intended Customs to distribute "all interest," including delinquency interest, to ADPs under the

CDSOA.  Customs completely ignores this stinging congressional rebuke of its

failure to do so.

Senator Thune's statement also confirms that distributing delinquency

interest, in addition to AD/CVD duties and section 1677g interest, is not "treble

compensation," as Customs contends.  Defs.-Appellees' Br. 44.  Sections 1677g

and 1505(d) interest cover different time periods.  Both of those delays harm ADPs

because of the time value of money.  As Senator Thune noted, "CBP's misreading

of the law" effectively forced ADPs "to pay for the delays."  162 Cong. Rec. S843.

Delinquency interest merely makes ADPs whole.  By disregarding the plain

language of the CDSOA, Customs unlawfully deprived ADPs of the compensation

to which they are entitled and instead unjustly enriched the Government at their

expense.

## II.    THE COURT SHOULD NOT DEFER TO CUSTOMS' DECISION NOT TO DISTRIBUTE DELINQUENCY INTEREST

The Trade Court erred in holding that Customs' decision not to distribute

delinquency interest to ADPs was entitled to *Chevron* deference.  *See* Appx0020-

0025.  As a threshold matter, Customs' decision does not qualify for *Chevron*

deference because it:  (1) was not a proper exercise of the limited procedural

authority that Congress delegated to Customs; (2) was based on Customs'

"technological limitations," Appx3683, rather than an actual interpretation of the

CDSOA; and (3) was not promulgated in any manner carrying the force of law.  To

17

the extent that Customs' decision may be considered an "interpretation," it fails

both steps of *Chevron* because:  (1) the CDSOA unambiguously requires Customs

to distribute "all" interest earned on AD/CVD duties, which includes delinquency

interest, and (2) Customs' decision to the contrary is an unreasonable interpretation

of the CDSOA.

### A. Congress Delegated Customs Only Limited Authority to Prescribe Logistical Procedures, Not to Substantively Interpret or Modify the Statute

*Chevron* deference "is warranted only 'when it appears that Congress

delegated authority to the agency generally to make rules carrying the force of law,

and that the agency interpretation claiming deference was promulgated in the

exercise of that authority.'"  *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006)

(quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).

A point heading of Customs' brief asserts that "Congress delegated to CBP

the authority to administer the CDSOA."  Defs.-Appellees' Br. 45.  The ensuing

section, however, does not discuss the statute at all.  *See id.* at 45-46.

The text of the CDSOA establishes that Congress delegated only limited

authority to Customs to "prescribe procedures" and "the time and manner" for

distributions.  19 U.S.C. § 1675c(c), (e)(3).  Congress did <u>not</u> authorize Customs to

substantively interpret or modify the statute with respect to the <u>content</u> of such

distributions.  Customs thus exceeded the bounds of its authority delegated under

the CDSOA when it decided that it would not distribute delinquency interest to ADPs, and that decision is due no deference.

### B. The Administrative Record Shows That Customs Did Not Interpret the CDSOA When It Decided Not to Distribute Delinquency Interest

Moreover, the administrative record establishes that Customs' decision not to distribute delinquency interest was not actually based on an "interpretation" of the text of the CDSOA but on Customs' "technological limitations."[4]  Appx3683. Customs initially planned to distribute delinquency interest to ADPs, but later scrapped those plans <u>solely</u> due to such "technological limitations."

### 1. Customs Initially Planned to Include Delinquency Interest in CDSOA Distributions

In February 2001, Customs made "decisions and work assignments" in connection with "the proposed rulemaking" regarding the procedures for CDSOA distributions.  Appx4187-4188.  One of such decision was that certain Customs offices "will consider possible methods for assigning 1505 interest to specific AD/CV cases for purposes of deposit into the Clearing Account and eventually

---

[4] Customs incorrectly asserts the Trade Court made a "factual finding" that Customs interpreted the CDSOA.'" Defs.-Appellees' Br. 53.  Interpreting a statute is not a "factual finding."  Rather, statutory interpretation is an issue of law that this Court reviews *de novo*. *Facebook, Inc. v. Windy City Innovations, LLC*, 973 F.3d 1321, 1330 (Fed. Cir. 2020).

transfer into the Special Account for disbursement." Appx4188. This decision

was "based on the current position of the agency[.]" *Id.*

The fact that Customs considered ways to deposit and distribute section

1505 delinquency interest assigned to AD/CVD duties — not whether it was to be

distributed in the first place — shows that Customs understood that such action

was required under the CDSOA. This belies Customs' argument that the CDSOA

only requires distribution of section 1677g interest. *See* Defs.-Appellees' Br. 26-

44.

Customs attempts to downplay the significance of this fact by harping on the

word "assigning," asserting that "the CDSOA's language does not provide for

assigning interest." Defs.-Appellees' Br. 51. Customs ignores the prepositional

phrase at the end of the sentence, which clarifies that the "purposes of deposit" and

eventual "disbursement" of delinquency interest was not in doubt. Appx4188.

Customs considered "possible methods for" effectuating distribution of

delinquency interest, not the possibility of distribution. *Id.*

Given that Customs' automated system could not differentiate delinquency

interest attributable to AD/CVD duties, Appx3683, it makes perfect sense that

Customs would need to consider possible methods for assigning delinquency

interest to AD/CVD duties to effectuate that purpose, *see* Appx4188. Indeed,

making the necessary changes to assign delinquency interest to AD/CVD duties so

that it could be properly deposited and distributed was precisely the kind of limited

logistical procedure that Congress authorized Customs to address.  *See* 19 U.S.C.

§ 1675c(c), (e)(3).

## 2.  The Documents Cited by Customs Are Irrelevant Because They Are Unrelated to Delinquency Interest

Nothing in the administrative record indicates that Customs' "decision" and

"position" regarding distribution of delinquency interest changed before Customs

published the Proposed Rule.  Customs cites three internal documents:  a January

2001 report, a May 2001 draft implementation plan, and a draft notice of proposed

rulemaking.  *See* Defs.-Appellees' Br. 49-51.   Those documents are irrelevant

because they do not contain any reference to delinquency interest collected from

importers or sureties, much less any statutory interpretation regarding such

delinquency interest.  *See* Appx3703-3707, Appx3723-3803, Appx4206-4213.

## 3.  Customs' Proposed Rule Was Silent Regarding Distribution of Delinquency Interest

Customs' Proposed Rule regarding CDSOA distribution procedures was

published in June 2001.  The proposed new 19 C.F.R. § 159.64(e) entitled "Interest

on Special Accounts and Clearing Accounts" stated that "no interest will accrue

in" the accounts because they "are not interest-bearing," but "statutory interest

charged on antidumping and countervailing duties at liquidation, will be

transferred to the Clearing Account or Special Account, as appropriate, when

collected from the importer." Proposed Rule, 66 Fed. Reg. at 33,926. There is

nothing in the Proposed Rule that states that CBP would not distribute delinquency

interest to ADPs as required by the statute.

Customs cites a comment submitted by a group of Senators (including

Senator Byrd). *See* Defs.-Appellees' Br. 34. Yet that comment, like the Proposed

Rule itself, does not even reference delinquency interest; rather, it simply states

that Customs should not deduct any "interest remitted to the importer" on any

overpayment of deposited amounts of AD/CVD duties from any distribution to

ADPs. Appx4068. Such an absurd result "would significantly undermine" the

purpose of the CDSOA.[5] Appx4068.

### 4. Customs' Subsequent Internal Decision Not to Distribute Delinquency Interest Was Due to Technological Limitations

By August 2001, however, Customs made an internal decision not to

distribute delinquency interest to ADPs. In a document dated August 19, 2001,

Customs stated: "Decision has been made that accrued interest for late payment of

bill will not be made available for disbursement under Byrd Amendment." *See*

Appx4256. No reasoning was given for the decision, which was not made public.

---

[5] Customs explicitly rejected that notion in the preamble to the Final Rule. *See* 66 Fed. Reg. at 48,550. Such interest is not "earned" on duties, but <u>owed</u> on a deposit overpayment. This refutes Customs' assertion that "all interest to the extreme" would include section 1677g interest owed to importers on overpayments. Defs.-Appellees' Br. 39 n.13.

Case: 22-2105    Document: 30    Page: 33    Filed: 05/05/2023

Customs' representative declared under penalty of perjury in this case that "the only reason" for Customs' "decision to distribute only 19 U.S.C. § 1677g interest" was the "technological limitations" of "Customs' automated system," which "did not differentiate the amount of 19 U.S.C. § 1505(d) delinquency interest, if any, that was attributable to CDSOA-subject lines of an entry." Appx3683.

### 5. Customs' Final Rule Was Also Silent Regarding Distribution of Delinquency Interest

Despite the change in Customs' internal position, the Final Rule, published in September 2001, stated in the provision entitled "Interest on Special Accounts and Clearing Accounts" that "no interest will accrue in" the accounts because they "are not interest-bearing," but "statutory interest charged on antidumping and countervailing duties at liquidation will be transferred to the Special Account, when collected from the importer." *See* Final Rule, 66 Fed. Reg. at 48,554, *codified at* 19 C.F.R. § 159.64(e). This language is almost identical to the Proposed Rule. *See* Proposed Rule, 66 Fed. Reg. at 33,926. Like the Proposed Rule, the Final Rule was silent as to whether delinquency interest would be distributed, and did not indicate that any type of interest would be excluded from the CDSOA's broad reference to "all" interest.[6]

---

[6] To the extent that the "at liquidation" language may refer to section 1677g interest, the final rule merely indicates that Customs will transfer such interest into

The preamble to the Final Rule states:

> Because Congress did not make an explicit provision for the accounts established under the CDSOA to be interest-bearing, no interest may accrue on these accounts. Thus, only interest charged on antidumping and countervailing duty funds themselves, pursuant to the express authority in 19 U.S.C. 1677g, will be transferred to the special accounts and be made available for distribution under the CDSOA.

66 Fed. Reg. at 48,550. Customs fixates on the word "only" in the second sentence while ignoring the first sentence, which provides critical context, limiting the discussion to the topic of whether the <u>accounts</u> would be interest-bearing. The preamble does not mention or provide any interpretation or reasoning regarding whether delinquency interest would be distributed.

Customs mischaracterizes the preamble as "a clarification to let the reader know that section 159.64(e)['s] use of the phase 'statutory interest charged on antidumping and countervailing duties at liquidation' means only section 1677g interest." Defs.-Appellees' Br. 46. The preamble is not a "clarification," however, because it does not reference the quoted phrase from the regulation. To the extent that Customs now relies on the preamble to justify excluding delinquency interest, it constitutes a substantive modification to the Final Rule and the codified regulation, which do not preclude distribution of delinquency interest, and the

---

the special accounts. It does not indicate that Customs would refuse to distribute other types of interest.

statute itself.  This result is legally impermissible.  *See N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 76 (1st Cir. 2018) ("A rule stated in a preamble is subject to the same analysis of whether its articulated policy is interpretive or legislative, and if it is the latter, it is procedurally improper.").

### 6. Customs First Disclosed Its Decision Not to Distribute Delinquency Interest More Than a Decade Later

Customs states that it "never took the public position that section 1505(d) interest would be distributed."  Defs.-Appellees' Br. 51.  Yet the record also demonstrates that Customs never took the public position during the rulemaking process that it would <u>not</u> distribute delinquency interest.  For more than a decade, Customs' annual reports and notices failed to disclose that it excluded delinquency interest from CDSOA distributions.  Customs first disclosed to Monterey that delinquency interest was excluded from CDSOA distributions during private conversations in 2014.  *See* Appx4272.  Customs first publicly stated its position that delinquency interest was "not distributable under the CDSOA" in its Fiscal Year 2015 Report to Congress.  Appx1299, Appx1308, Appx1311.

### C. Customs Did Not Promulgate an Authoritative Statutory Interpretation That Is Entitled to *Chevron* Deference

Even if Customs' decision is considered an "interpretation," it is not entitled to deference because Customs did not promulgate it in a manner carrying the force of law.  *See Mead*, 533 U.S. at 226-27.  Both the Proposed Rule and Final Rule

were silent regarding distribution of delinquency interest.  The preamble to 19

C.F.R. § 159.64(e) is not entitled to *Chevron* deference because it was not subject

to public notice and comment, appeared in the Final Rule only, and does not carry

the force of law.  *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 577 (2009); *Luminant*

*Generation Co. v. EPA*, 675 F.3d 917, 931 (5th Cir. 2012); *N.H. Hosp. Ass'n*, 887

F.3d at 76.

### D. Customs' "Interpretation" Is Unreasonable

As Customs' decision not to distribute delinquency interest was not an

authoritative interpretation promulgated in the exercise of the limited authority that

Congress delegated to Customs, the *Chevron* analysis is not triggered here.  *See*

*Gonzales*, 546 U.S. at 255-56; *Mead Corp.*, 533 U.S. at 226-27.  Even if it were,

Customs' decision fails both steps.

Under *Chevron*:

> At the first step, a court must determine whether Congress has
> "directly spoken to the precise question at issue."  If so, "that is
> the end of the matter; for the court, as well as the agency, must
> give effect to the unambiguously expressed intent of Congress."
> If not, then at the second step the court must defer to the
> agency's interpretation if it is "reasonable."

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016) (quoting *Chevron*,

467 U.S. at 842-44 (internal citations omitted)).

As detailed in Section I above, Congress directly and unambiguously required Customs to deposit and distribute "all" interest in the CDSOA. 19 U.S.C. § 1675c(d)(3), (e)(2). Customs' decision not to do so fails *Chevron* Step One.

Even if the plain language of the CDSOA were ambiguous (it is not), Customs' decision fails *Chevron* Step Two because it is an unreasonable interpretation of the statute.

### 1. Customs Failed to Explain Its Decision Not to Distribute Delinquency Interest During the Rulemaking Process

*Chevron* deference is not warranted where the agency "did not analyze or explain why the statute should be interpreted" in a particular manner during the rulemaking process. *Encino*, 579 U.S. at 220, 224. The Supreme Court has noted:

> One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. That requirement is satisfied when the agency's explanation is clear enough that its path may reasonably be discerned. But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.

*Id.* at 221 (internal quotation marks and citations omitted).

Customs failed to explain that it was interpreting the statute to exclude delinquency interest — much less <u>why</u> the statute should be interpreted in that manner — during the rulemaking process. The preamble to the Final Rule

explained that interest does not accrue on the special accounts because Congress

did not provide for them to be interest-bearing.  *See* 66 Fed. Reg. at 48,550.  By

contrast, it did not give any reasons for "only" section 1677g interest to be

deposited and distributed, <u>to the exclusion of delinquency interest</u>.  *Id.*

Accordingly, Customs' action is arbitrary and capricious and cannot carry the force

of law.

### 2. Customs' Reliance on Technological Limitations Is Not a Reasonable Excuse for Ignoring the Statute

An agency rule is also "arbitrary and capricious if the agency has relied on

factors which Congress has not intended it to consider."  *Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

Customs' decision not to distribute delinquency interest was based on the

"technological limitations" of its computer system.  Appx3683.  Customs' decision

is thus arbitrary and capricious because Customs relied on a factor that Congress

did not intend it to consider.

The Supreme Court has stated that it is "the core administrative-law

principle that an agency may not rewrite clear statutory terms to suit its own sense

of how the statute should operate."  *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328

(2014).  Agencies thus have "no power to tailor legislation to bureaucratic policy

goals by rewriting unambiguous statutory terms" and "are not free to adopt ...

unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." *Id.* at 325, 328.

Customs may not rewrite the statute to eliminate the requirement of distributing "all" interest simply because its automated system could not calculate delinquency interest attributable to AD/CVD duties. Customs' preexisting "technological limitations" and failure to perform the basic necessary calculations (through changes to its automated system or otherwise) are no excuse — and certainly not "reasonable" ones. As demonstrated in Section I.C. above, delinquency interest is easily calculable.

"It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. The "technological limitations" of Customs' automated system is the "only reason" of record for Customs' decision not to distribute delinquency interest, Appx3683, which cannot justify ignoring the plain language of the statute. The analysis must end there.

This Court must reject all of Customs' arguments as *post hoc* rationalizations that are not entitled to deference. *See Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 212 (1988) (noting that the Supreme Court has "declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question"); *Burlington Truck*

29

*Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept

appellate counsel's *post hoc* rationalizations for agency action.").

### 3. The Trade Court Improperly Deferred to Its Own Interpretation of the Statute

The Trade Court did not address the actual reason for Customs' decision not

to distribute delinquency interest — its "technological limitations" — and rejected

Customs' interpretation of the CDSOA. *See* Appx0001-0026. The Trade Court,

however, crafted and deferred to its own interpretation of the term "interest earned

on," Appx0014-0016, one which Customs never previously advanced.

The Trade Court thus violated the "simple but fundamental rule of

administrative law" that "a reviewing court…must judge the propriety of [agency]

action solely by the grounds invoked by the agency.  If those grounds are

inadequate or improper, the court is powerless to affirm the administrative action

by substituting what it considers to be a more adequate or proper basis." *SEC v.*

*Chenery Corp.*, 332 U.S. 194, 196 (1947).  "It is not the role of the courts to

speculate on reasons that might have supported an agency's decision," as they

"may not supply a reasoned basis for the agency's action that the agency itself has

not given." *Encino*, 579 U.S. at 224 (internal quotation marks and citations

omitted).

This Court must reject Customs' unreasoned and unreasonable decision and the Trade Court's made-up interpretation under the fundamental principles of administrative law.

## III.   MONTEREY'S PRE-2014 CLAIMS ARE TIMELY

Monterey's claims to delinquency interest on CDSOA distributions received prior to July 15, 2014, are timely because, as reviewed in Section II.B above, Customs first notified Monterey of Customs' decision to exclude delinquency interest from CDSOA distributions in 2014.  *See* Appx4272.  "A cause of action accrues when all events necessary to state the claim, or fix the alleged liability of the Government, have occurred.  In other words, a claim accrues when the aggrieved party reasonably should have known about the existence of the claim.'" *Mitsubishi Elecs. Am., Inc. v. United States*, 44 F.3d 973, 978 (Fed. Cir. 1994) (internal quotation marks and citations omitted).  Monterey brought the present action in 2016 pursuant to 28 U.S.C. § 1581(i), which has a two-year statute of limitations.  *See* 28 U.S.C. § 2636(i).  As Monterey first discovered CBP's *ultra vires* actions in 2014, Monterey's pre-2014 claims were timely filed.

The Final Rule and the codified regulation could not have provided notice of Customs' unlawful actions because they were silent regarding distribution of delinquency interest.  The language of the Final Rule did not meaningfully differ from the Proposed Rule, which was published when Customs was considering

31

ways to distribute delinquency interest. *Compare* Final Rule, 66 Fed. Reg. at

48,554, *and* 19 C.F.R. § 159.64(e), *with* Proposed Rule, 66 Fed. Reg. at 33,926.

The preamble language on which CBP relies pertains to a completely different

topic, specifically whether the special <u>accounts</u> would be interest-bearing.

An agency's notice is insufficient where, as here, "interested parties would

have had to divine [the Agency's] unspoken thoughts," or engage in a "scavenger

hunt" to discern the underlying explanation. *See Aqua Prods., Inc. v. Matal*, 872

F.3d 1290, 1320, 1322 (Fed. Cir. 2017) (internal quotation marks and citation

omitted); *see also Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1374

(Fed. Cir. 2017) (determining that Federal Register notices were insufficient

because they did not make the agency's intentions "obvious to an interested

observer" (internal quotation marks and citation omitted)).  Neither the Final Rule

nor its preamble provided notice of Customs' decision to disregard its statutory

mandate under the CDSOA to include all interest in distributions made to ADPs.

The public was not on notice of Customs' decision until many years later,

starting with Customs' 2015 Report to Congress.  When Congress learned of

Customs' unlawful decision, Congress denounced it and swiftly enacted at least a

partial remedy in the form of TFTEA.

## **<u>CONCLUSION</u>**

For the reasons discussed above and in Monterey's opening brief, Monterey respectfully requests that this Court reverse the Trade Court's judgment and direct the Trade Court, on remand, to enter judgment in favor of Monterey.

Respectfully submitted,

*/s/ Adam H. Gordon*

Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700

Dated:  May 5, 2023                    *Counsel to Plaintiff-Appellant Monterey*
*Mushrooms, Inc.*

# **CERTIFICATE OF COMPLIANCE**

This response brief complies with the type-volume limitation of Rule 32(b)(1) of the Federal Rules of Appellate Procedure.

This response brief contains 6,994 words.

This response brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure, and the typestyle requirements of Rule 32(a)(6) of the Federal Rule of Appellate Procedure, in accordance with Rule 27(d)(1)(E) of the Federal Rules of Appellate Procedure.

This response has been prepared in a proportionally spaced type face using Microsoft Word in Times New Roman 14-point font.

*/s/ Adam H. Gordon*
Adam H. Gordon
The Bristol Group PLLC
*Counsel to Plaintiff-Appellant Monterey Mushrooms, Inc.*

Dated: May 5, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of May, 2023, a copy of the foregoing

brief was served on the following party by operation of the Court's electronic-

filing system:

Beverly A. Farrell
Trial Attorney
**Department of Justice**
International Trade Field Office
26 Federal Plaza, Suite 246
New York, New York 10278
Email:  Beverly.a.farrell@usdoj.gov


*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Plaintiff-Appellant Monterey
Mushrooms, Inc.*

Dated:  May 5, 2023